UNITED STATES of America, Plaintiff,

v.

Jude G. DEL PERCIO, Indiana and Michigan Electric Company, a corporation, and American Electric Power Service Corporation, a corporation, Defendants.

No. G86–94 CR.

United States District Court,
W.D. Michigan, S.D.

March 20, 1987.

John A. Smietanka, U.S. Atty., Grand Rapids, Mich., Barry Blyveis, Criminal Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Larry C. Willey, Local Counsel, Grand Rapids, Mich., J. Patrick Hickey and Gerald Charnoff, Thomas C. Hill, Shaw Pittman Potts & Trowbridge, Washington, D.C., for Del Percio.

Dennis C. Kolenda, Grand Rapids, Mich., J. Patrick Hickey and Gerald Charnoff, Thomas C. Hill, Shaw Pittman Potts & Trowbridge, Washington, D.C., for Indiana and Michigan Elec. Co. and American Elec. Power Service Corp.

## OPINION GRANTING DEFENDANTS' MOTION TO DISMISS

HILLMAN, Chief Judge.

On September 10, 1987, the government filed a nine count indictment against Jude G. Del Percio, Indiana and Michigan Electric Company ("IMECo"), and American Electric Power Service Corporation ("AEPSC"). Count One alleges that defendants, in a letter dated March 27, 1981, knowingly submitted false statements to the Nuclear Regulatory Commission ("NRC") concerning the fire protection regulation known as Appendix R and thus violated 18 U.S.C. § 1001. Counts Two and Three allege that the defendants' failure to provide the NRC with plans and schedules for Appendix R modifications or requests for exemption on or before March 19, 1981, as required by 10 C.F.R. § 50.48(c)(5) and (6), constitutes a willful violation, under 42 U.S.C. §§ 2131 and 2272, of the licenses issued to IMECo for Units 1 and 2 of the D.C. Cook Nuclear Plant. Counts Four and Five allege that the defendants' failure to comply with these Appendix R regulations also violates 42 U.S.C. § 2273(a) which makes the willful violation of an NRC regulation a crime. Counts Six and Seven charge that beginning on March 19, 1981, defendants' alleged willful failure to make modifications necessary to comply with Appendix R was a willful violation, under 42 U.S.C. §§ 2131 and 2272, of the licenses of Cook Units 1 and 2. Counts Eight and Nine allege that this failure to modify Units 1 and 2 provides a basis for prosecution under 42 U.S.C. § 2273(a).

On January 26, 1987 the parties argued three motions before this court. Two of the motions were brought by defendants pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. In the first of these, defendants moved for dismissal of the indictment as barred by the statute of limitations. In the second they sought dismissal of the indictment on the ground that it fails to allege the essential elements of the offenses charged.

The third motion, brought by the government, requests that the court address an alleged conflict of interest "situation" arising out of the fact that the law firm of Shaw, Pittman, Potts & Trowbridge represents defendants as well as former employees of IMECo and AEPSC, who may be called as witnesses at trial.

For the reasons discussed below, I have granted defendants' motion for dismissal of the indictment on the grounds that the offenses alleged are barred by the applicable statute of limitations. As this ruling is dispositive of the case, I do not address the merits of the other two motions.

### I. *Factual Background*

On November 19, 1980, the NRC revised Section 50.48 and Appendix R of Title 10, Code of Federal Regulations, Part 50, both of which deal with fire protection at nuclear power plants. By its terms, Appendix R became effective on February 17, 1981. The revised regulations required that utilities submit to the NRC plans and schedules for making these modifications by March 19, 1981. 10 C.F.R. § 50.48(c)(5). In addition, the regulation provided that utilities could seek exemption from the provisions of Appendix R by March 19, 1981. The filing of an exemption request tolled the requirements of Appendix R pending NRC resolution of such a request. 10 C.F.R. § 50.48(c)(6).

AEPSC provides technical and licensing support to IMECo, and within AEPSC the Appendix R matter was assigned to defend-

ant Jude G. Del Percio, an engineer in the Nuclear Safety and Licensing section. He drafted the letter and technical attachment that was ultimately sent to the NRC on March 27, 1981 as "the March 19, 1981 submittal required by Appendix R." According to the submittal, "[t]he information and references provided [therein] demonstrate compliance with ... Appendix R." No plans or schedules for modifications were proposed.

Following an NRC inspection at the Cook plant in April 1982, the NRC Office of Investigations ("OI") initiated an investigation to determine whether the IMECo March 27, 1981 submittal contained material false statements. By early 1984, the NRC had referred this matter to the Department of Justice for criminal investigation. A grand jury began hearing testimony in July of 1984, and continued to hear testimony until its term expired on February 20, 1986. At that time an indictment had still not been returned, and subsequently a new grand jury was empaneled.

In March of 1986, with the statute of limitations approaching on at least the false statements charge, the corporations and the individuals still under investigation executed documents purporting to extend the statute of limitations for 90 days to June 24, 1986. The language of these documents is limited to violations of 18 U.S.C. §§ 371 and 1001 (Count I), and thus cannot be construed to apply to the alleged Atomic Energy Offenses (Counts II through IX). As the June 24, 1986 deadline approached, the government determined that it needed more time for its investigation. Accordingly, the two corporate and three potential individual defendants signed waiver forms substantially identical to those executed in March, 1986.

In late August 1986, the government was prepared to present the case for indictment. However, on the urging of defense counsel, it agreed to reappraise its position. A third waiver of the statute of limitations was executed to allow for the government's review. Ultimately the government determined that it would proceed with the prosecution and on September 10, 1986, a grand jury in the Western District of Michigan returned the nine count indictment described above.

## II. *Discussion*

The statute of limitations for most criminal offenses and for all of the Atomic Energy Act offenses charged in the indictment is five years as provided by 18 U.S.C. § 3282. Section 3282 provides:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

Defendants assert that this provision bars the government's indictment.

With respect to Count One, defendants argue that the statute of limitations' requirements are jurisdictional. Consequently, they conclude that the waivers described above are without legal effect.

With respect to Counts Two through Nine, defendants argue that the government incorrectly characterized the charged violations as "continuing" and thus illegally extended the statute of limitations period until April 30, 1987. Each of these last eight counts charge defendants with violating either 42 U.S.C. §§ 2131 and 2272 or 2273(a) from "on or about March 19, 1981 and continuing to on or about April 30, 1982." (Indictment, Sept. 10, 1986 at 11, 13, 15, 17, 19, 21, 23 and 25.) Defendants argue that the offenses are not continuing but were complete as of March 19, 1981 and that the statute of limitations consequently expired on March 19, 1986, nearly six months prior to the return of the indictment.

Defendants' arguments must be addressed in the light of the purpose and function of statutes of limitations. Statutes of limitations protect citizens from having to answer to overly stale criminal charges. *United States v. Ewell*, 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966). Limiting exposure to criminal prosecution to a fixed time period minimizes the possibility that individuals will have to de-

fend themselves against charges involving facts that have been obscured by the passage of time and encourages law enforcement officials to investigate suspect activity promptly. *See Toussie v. United States,* 397 U.S. 112, 114–15, 90 S.Ct. 858, 859–60, 25 L.Ed.2d 156 (1970). In most instances the limitations period starts to run when a crime is complete, *Pendergast v. United States,* 317 U.S. 412, 418, 63 S.Ct. 268, 270, 87 L.Ed. 368 (1943), and generally a crime is deemed complete when each element of the crime has occurred. *United States v. Smith,* 740 F.2d 734, 736 (9th Cir.1984). Exceptions to this rule are rare. 22 C.J.S. Criminal Law § 228(1) (1961). Finally, it should be noted the United States Supreme Court has ruled that "criminal limitations statutes are 'to be liberally interpreted in favor of repose.'" *United States v. Habig,* 390 U.S. 222, 227, 88 S.Ct. 926, 929, 19 L.Ed.2d 1055 (1968) (*quoting United States v. Scharton,* 285 U.S. 518, 522, 52 S.Ct. 416, 417, 76 L.Ed. 917 (1932)).

### A. The Continuing Offense Exception (Counts II–IX)

The Supreme Court has distinguished the "instantaneous" from the "continuing" offense in that in the commission of an act of the former type, the illegal aim is attained as soon as every element of the crime has occurred, whereas in the commission of an act of the latter type, "the unlawful course of conduct is 'set on foot by a single impulse and operated by an unintermittent force,' until the ultimate illegal objective is finally attained." *Toussie, supra,* 397 U.S. at 136, 90 S.Ct. at 871 (White, J. dissenting) (*citing United States v. Midstate Co.,* 306 U.S. 161, 166, 59 S.Ct. 412, 414, 83 L.Ed. 563 (1939)). So defined, a continuing offense is an exception to the rule that an offense is complete and the limitations period starts to run when each element of that offense has occurred. In light of the general principles regarding statutes of limitations and the explicit Congressional determination in 18 U.S.C. § 3282 that statutes of limitations should not be extended "[e]xcept as otherwise expressly provided by law," the Supreme Court, in *Toussie,* ruled that an offense should not be charac-

terized as continuing "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie, supra,* 397 U.S. at 115, 90 S.Ct. at 860.

Neither of these tests is satisfied here. With respect to the "explicit language" test, I find no words within the Atomic Energy Act that could be construed to support a finding that the cited offenses are continuing. In fact, the very structure of the Act strongly suggests that Congress purposefully omitted language from the relevant sections that might have been so interpreted.

With respect to the second test ("nature of the offense"), a thorough examination of the legislative history of the Act and the cases cited by the government fails to provide any evidence to suggest that the nature of the crimes alleged in this indictment is such that Congress "must have assuredly intended" that they be treated as continuing. *Toussie, supra* at 115, 90 S.Ct. at 860.

### 1. Language and Structure of the Statute

None of the sections of the Atomic Energy Act under which defendants are indicted contains language suggesting that Congress intended the offenses described therein to be treated as continuing or subject to anything other than the generally applicable five-year criminal statute of limitations. This is particularly revealing in light of the fact that on a number of occasions over the past 40 years Congress has addressed statute of limitations and continuing offense issues with respect to the Atomic Energy Act.

In 1954, Congress amended the general statute of limitations provision, 18 U.S.C. § 3282, to increase the period for criminal prosecution from three to five years. Just two days earlier it had added Section 2278 to the Atomic Energy Act. 42 U.S.C. § 2011 *et seq.* Section 2278 extends the

statute of limitations period from three to ten years for violations of Sections 2274 (communication of restricted data), 2275 (receipt of restricted data), and 2276 (tampering with restricted data). Apparently Congress believed that without such an explicit extension these provisions of the Act would be subject to the five year limitation of 18 U.S.C. § 3282. A five-year limitation for these sections was deemed inappropriate in light of the ten-year limitation period governing comparable provisions of the Espionage Act. *Hearings Before the Joint Comm. on Atomic Energy*, Part II, 83d Cong., 2d Sess. (June 2, 1954) at 610 (statement of Eugene M. Zuckart, member, Atomic Energy Comm.). No similar concerns regarding the appropriateness of the general five-year limitation were raised with respect to the offenses charged in this case.

In 1969, Congress addressed the continuing nature of certain civil and criminal offenses under the Atomic Energy Act. The attention of Congress, in this instance, was directed specifically at the penalty provisions of these offenses. However, Congressional intent that a continuing character should not, for any purpose, be impuned to the criminal offenses charged in this case, is manifest in its development of these various provisions. Prior to 1969, the Atomic Energy Commission, the predecessor of the NRC, could suspend, modify, or revoke licenses and issue cease and desist orders with respect to persons who violated the licensing provisions of the Act or any rule, regulation, order, or license issued thereunder. Intent on providing the Commission with greater flexibility in carrying out its regulatory functions, Congress added a new section to the Act, currently Section 2282(a), allowing for the imposition of monetary penalties in instances of civil violations. It enabled the Commission to levy separate fines for individual violations and, more significantly for our analysis, daily fines for what it defined as "continuing" violations. Sen.Rep. No. 91–553, 91st Cong., 1st Sess. (1969) *reprinted in* 1969 U.S.Code Cong. & Admin.News, 1607, 1615–17.

Congress simultaneously amended the predecessors of the criminal provisions at issue in this case. With respect to what is currently Section 2272, it deleted the death penalty provision and clarified the courts' ability to impose prison terms and sentences. With respect to the provision preceding current Section 2273(a), the section criminalizing violations of the Atomic Energy Act generally, Congress added the word "criminal" before the word "penalty" to clarify that the penalties referred to in that section do not include the civil monetary penalties imposed under Section 2282. Sen. Rep. No. 91–553, 91st Cong. 1st Sess. (1969), *reprinted in* 1969 U.S.Code Cong. & Admin.News 1608. Congress did not amend the early forms of either Section 2272 or Section 2273(a) to allow for continuing daily fines similar to those available for violation of the civil provisions.

Clearly Congress intended to differentiate between civil and criminal penalties for violations of the Act. Had it wanted to make the criminal penalties in any of the charged criminal sections continuing, it could easily have done so. Having failed to do so, the distinction must be presumed to have been intentional. *See United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952) (holding that the criminal provision of the Fair Labor Standards Act did not make a separate criminal offense of each underpayment of an employee, even though the Act's civil liability provisions expressly recognized a right in each individual employee to maintain an action for restitution and damages). In fact, nearly a dozen years after it enacted the 1969 amendments, Congress added a second criminal provision to Section 2273 which it specifically made continuing for penalty purposes. 42 U.S.C. § 2273(b). Because this section and Sections 2272 and 2273(a) relate to the same subject matter, imposition of penalties, they should all be taken into consideration when construing any one. *See United States v. Eklund*, 733 F.2d 1287 (8th Cir.1984 (en banc)). Thus, the failure of Congress to add continuing language to Section 2272 and Section 2273(a) when it enacted Section 2273(b) can-

not be presumed to have been anything but purposeful.

This presumption finds further support in the blunt language with which Congress has rendered other offenses continuing for statute of limitations purposes. For example, Title 18 U.S.C. § 3284 provides that concealment of a bankrupt's assets shall "be deemed to be a continuing offense ... and the period of limitations shall not begin to run until such final discharge or denial of discharge." Title 22 U.S.C. § 618(e) provides that "[f]ailure to file any such registration statement or supplements thereto as is required by either section 612(a) or section 612(b) of this title shall be considered a continuing offense for as long as such failure exists, notwithstanding any statute of limitation or other statute to the contrary." Title 50 U.S.C.App. § 454(a) provides that "any [draft] registrant who has failed or refused to report for induction shall continue to remain liable for induction ..." Title 18 U.S.C. § 3290 provides that "[n]o statute of limitations shall extend to any person fleeing from justice."

Similarly, Congress has spoken with an unequivocal voice when it has sought to ensure that certain acts would be covered by a limitations period greater than five years. Thus, it has enacted ten-year statute of limitations periods for gathering, transporting or losing defense information, 18 U.S.C. § 793; gathering or delivering defense information to aid a foreign government, 18 U.S.C. § 794; harboring persons suspected of such acts, 18 U.S.C. § 792; committing fraud related to nationality, citizenship, and passports, 18 U.S.C. § 3291; and conspiring to establish a totalitarian dictatorship, 50 U.S.C. § 783(e).

In light of these statutes, the failure of Congress to include in Sections 2272 and 2273(a) any language suggesting that the proscribed acts should be viewed as continuing for any purpose, is particularly telling. It can lead to only one conclusion under the first *Toussie* test: the acts with which defendants are charged are not continuing.

### 2. The Nature of the Crime

Neither do I believe that the proscribed acts can be characterized as continuing under the second *Toussie* test. The government has failed to convince me that the nature of any of the crimes charged is such that Congress "must have assuredly intended" that they be treated as continuing. *Toussie, supra,* 397 U.S. at 115, 90 S.Ct. at 860. In an attempt to prove that Congress did so "assuredly intend," the government proffers a so-called "logical" argument that rests largely on the notion that defendants' alleged crimes can be characterized as "use and possesion" of a controlled substance. (*See also* Government's Opposition, Dec. 22, 1986 at 18, 24–25.) In support of this view, the government urges that "the expiration of the statute of limitations should be discussed in terms of the applicable statutory sections because it is those sections which define the crimes charged." (*Id.* at 15.) In other words, the government argues that the essential elements of the crime are not defined by the regulations but are articulated entirely in the statute. Thus, "use" and "possession" become essential elements and therefore, the government implies, the crime is continuing. Put another way, the crime is not complete, and the statute of limitations does not start to run, until there has been a correction of the violation or an agreement has been reached as to when correction will take place.

Reflecting this view, the government states that the crime charged in Counts Two, Three, Six, and Seven under Sections 2131 and 2272 is "possessing, using, and operating a nuclear power plant in violation of applicable fire safety regulations." (*Id.* at 17) The criminal act, according to the government, was "the operation of the plant in violation of its license, not the violation of an applicable regulation." (*Id.*) As regards Section 2273(a) (Counts IV, V, VIII, and IX), the government argues that "[o]nly by operating a plant which lacked the required physical characteristics and for which no written material had been submitted did [the defendants] violate the regulations, and therefore the statute." (*Id.* at 20.) Thus, according to the govern-

ment, the crimes were not complete until April 30, 1982 when the licensee, in response to a NRC show cause order, promised to abide by an accelerated schedule for coming into compliance with Appendix R.

Citing the above characterization of the law and facts, the government contends that "[t]here is no way to avoid analyzing the Defendants' violations of §§ 2131, 2272 and 2273(a) as continuing crimes." (*Id.* at 21.) In an attempt to bolster the logic of this analysis, the government analogizes the situation here to what it referred to in oral argument as "use and possession cases involving other controlled substances." (*See also id.* at 24.)

I find both of the government's arguments unconvincing. First, acceptance of the government's contention that the chargeable offense can be found entirely within the statute, would make it practically impossible to discuss, let alone charge to a jury, an offense under Sections 2131 and 2272 or 2273(a). Section 2273(a) makes it a crime to willfully violate any provision of the Atomic Energy Act for which there is not a specified criminal penalty. Section 2272 makes it a crime to willfully violate Section 2131, and Section 2131 states only that "[i]t shall be unlawful ... for any person within the United States to ... possess [or] use ... any utilization facility ... except under and in accordance with a license issued by the Commission pursuant to section 2133 [the licensing provision] ... of this title." Clearly, no crime under these provisions can be described without reference to the regulatory provisions upon which the grant of a license is premised.

Second, even if "use and possession" of a facility could somehow be defined without reference to the underlying licensing regulations, the government's argument is rendered untenable by the fact that the only provisions containing use and possess language are not properly applicable to the alleged violations in this case. Section 2131, as incorporated by Section 2272, is the only charging provision containing use and possess language. Yet the legislative history of Sections 2131 and 2272 makes it clear that these provisions were not intend-

ed for indictment of commercial licensees who violate NRC regulations. The primary concern of these two sections, which allow for significantly stiffer criminal penalties than 2273(a), is national security not commercial regulation.

Section 7(a) of the Atomic Energy Act of 1946, Pub.L. No. 79–585, preceded Sections 2131 and 2272. When it was enacted there was no commercial nuclear industry in the United States and there was no immediate expectation that the government would license private utilities to use nuclear materials. In fact, Section 7(b) required the Atomic Energy Commission to report to Congress "whenever in its opinion any industrial, commercial or other non-military use of fissionable material has been sufficiently developed to be of practical value...." The Act, which was first introduced in Congress three months after the bombing of Hiroshima and Nagasaki, S.Rep. No. 1211, 79th Cong., 2d Sess. 1 (1946), *reprinted in* 1946 U.S.Code Cong. & Admin.News 1327, by its own terms made it clear that it was "subject at all times to the paramount objective of assuring the common defense and security." Pub.L. No. 79–585, § 1(a). Section 2131, as incorporated by Section 2272, was intended only to criminalize transfer, receipt, manufacture, production, acquisition, possession, use, importation or exportation of nuclear materials when it takes place outside of the system of regulations authorized by the Act.

An examination of the three other sections for which Section 2272 sets criminal penalties supports the view that the "use and possession" language of Section 2131 was not intended to be applied to those operating commercial nuclear power generators which, while licensed, are in some manner violating the terms of their licenses or the regulations issued pursuant to the Atomic Energy Act. Section 2122 contains the same prohibitions as Section 2131 except that it refers to nuclear weapons rather than nuclear material. Section 2138 provides the NRC with the power to suspend, during times of war, any license granted under the Act. And Section 2077 criminalizes the handling of nuclear material with-

out a license issued pursuant to Section 2073. Three of the provisions cited in Section 2272, including Section 2131, prohibit any use of nuclear material which is completely outside the regulatory scheme of the Act. The fourth describes the circumstances under which, for national security purposes, the NRC may subject use of nuclear material to special control provisions.

The inappropriateness of the government's use and possession theory is further evidenced in the illogic of the complete overlap of Section 2272 and Section 2273(a) which it mandates. In order to demonstrate this, it is helpful to review again the eight Atomic Energy Act offenses charged in the instant indictment. The underlying act alleged in Counts Two through Five is the failure of defendants to provide by March 19, 1981, Appendix R design descriptions, plans, schedules, or exemption requests as required by 10 C.F.R. § 50.-48(c)(5) and (6). The underlying act alleged in Counts Six through Nine is the failure of defendants to make certain unidentified modifications by March 19, 1981, as required by Appendix R. The government has charged each alleged regulatory violation for each Cook unit as two separate crimes, once under 42 U.S.C. § 2273(a) and once under 42 U.S.C. §§ 2272 and 2131. Accordingly, the government charges that Section 2273(a), which makes it a crime to "willfully violate ... any [NRC] regulation," was violated when the defendants, with regard to both Cook Unit 1 and 2, did not file the appropriate Appendix R responses by March 19, 1981 (Counts IV and V), and when the defendants did not make required Appendix R physical plant modifications by March 19, 1981 (Counts VIII and IX). The government further charges that this exact conduct, the failure of defendants to file responses and to make modifications with respect to Cook Units 1 and 2, constitutes license violations under Sections 2272 and 2131 (Counts II, III, VI, and VII). This attempt to multiply the charges rests on the novel conclusion that Congress intended the exact same conduct to be punishable under two criminal provisions within the same Act, and that it further intended that there be no regulatory violation

charged under 42 U.S.C. § 2273(a) that could not also be charged under and subject to the stiffer penalties of Section 2272. I find this to be an untenable proposition.

Even if indictment under Sections 2131 and 2272 is appropriate in a violation situation, the government's argument that the "use and possession" language contained in those sections demonstrates that Congress "assuredly intended" that these violations be treated as continuing is not supported by precedent. The government's argument that it is, rests on three cases.

The government first cites *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Stating that the Supreme Court in *Bailey* held that escape from federal custody is a continuing offense even though nothing in the language of the statute prohibiting escape defines it as continuing, the government argues:

> The logic is, of course, that if escape were not a continuing offense, the escapee could emerge from hiding after five years and a day to celebrate his freedom. Similarly, if the defense argument in this case is valid, a nuclear plant licensee which commits an act which causes the plant to be in violation of its license or NRC regulations can celebrate its freedom, five years and a day later, to operate the plant in violation of those regulations.

(Government's Opposition, Dec. 22, 1986 at 22.) Two problems exist with this reasoning.

First, the premise on which it is based is flawed. Although the Supreme Court found that escape from prison is a continuing crime, it did so largely on the basis of two factors that the government failed to mention. The Supreme Court relied on the fact that every lower federal court that has considered prison escape has held that it is a continuing crime. *Bailey, supra* at 413, 100 S.Ct. at 636. More significantly, the Court based its decision on 18 U.S.C. § 3290 which explicitly tolls the statute of limitations during the time that a person fleeing from justice is at large. *Id.* at 413–14, 100 S.Ct. at 636. There are no

similar factors on which a decision in this case can be based.

Second, to whatever small degree the Supreme Court's finding that escape from prison is a continuing offense is based on an analysis of the nature of that act, the reasoning is not applicable to the facts here. Quoting from *Toussie*, the Supreme Court said:

> Given the continuing threat to society posed by an escaped prisoner, "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."

*Bailey, supra* at 413, 100 S.Ct. at 636 (*citing Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970)). This statement comprises the full measure of the Court's analysis of the nature of escape. To the extent that any inference can be drawn from this comment, it is that escape might be construed as being continuing in nature because there is no redeeming social value in having an escaped prisoner at large.

The situation in this case stands in sharp contrast. Significant social value could well exist in continuing to possess and operate a nuclear power plant despite the existence of certain violations. This does not mean, of course, that violations will never warrant shutdown. (IMECo itself was subject to a show cause order as to why it should not be shut down if it did not correct the violations alleged here.) It means only that the nature of this regulatory crime does not warrant treatment under the continuing offense doctrine absent some explicit indication from Congress that such treatment is appropriate. Furthermore, it is in this type of situation, a regulatory case involving complicated facts in which the potential harm caused by the alleged violation was long ago eliminated, that the value society places on not forcing individuals to defend against stale charges should be given greatest weight.

The government also rests its argument on an assertion from *United States v. Fleetwood*, 489 F.Supp. 129 (D.C.Ore.1980), in which the district court stated:

> [T]he nature of a crime such as concealing and retaining stolen property, where possession is the essence of the offense, is such that Congress must have intended it be treated as a continuing offense.

*Id.* at 132. First, it must be noted that this case is inappropriate on its facts. The issue in *Fleetwood* was whether the defendant, who was charged with "concealing" and "retaining" stolen U.S. Savings Bonds, could be prosecuted for possessing those bonds in 1979 when they were stolen in 1970 by some unknown person and no evidence existed that the defendant himself had "concealed" or "retained" the bonds prior to 1979. By contrast, the crimes that defendants here are alleged to have committed through April 1982 are the exact same crimes that they are alleged to have first committed on March 19, 1981.

However, even if the quoted assertion is examined in isolation from the facts of *Fleetwood*, it does little to advance the government's position. While the *Fleetwood* court was not unaware of the *Toussie* case, it directly rests its assertion that a crime involving possession of stolen property should be treated as continuing, on a line of cases that emerged before *Toussie*. Leaving aside the question of whether violating regulations governing the production of nuclear power is analogous to receiving and concealing stolen property, I am satisfied that a district court case which is based on a line of cases that emerged prior to the governing Supreme Court case is of little precedential value.

Finally, citing *United States v. Stitzer*, 785 F.2d 1506 (11th Cir.1986), the government asserts that since that court held that possession with the intent to distribute cocaine is a continuing offense, this court should find that possession of a nuclear plant with an outstanding regulatory violation is also a continuing offense. I fail to see the analogy. While the term "continuous offense" is of significance in both the *Stitzer* decision and this decision, the issue with regard to which that term was used in the former case differs enormously from the issue raised here. The issue before the *Stitzer* Court was not whether in the absence of any statutory language indicating

that a crime is continuing, it can nonetheless be found to be of such a nature that Congress must assuredly have intended that it be treated as such. Rather, the *Stitzer* Court faced the question of when the crime of drug smuggling may be considered complete for the purpose of determining venue. *Stitzer* holds that importation of a controlled substance is a "continuous crime" that is not complete until the controlled substance reaches its final destination. Thus, it concludes, venue may properly be had in any district through which a controlled substance passes. Clearly the import of "continuous" in that case is inapplicable to this case.

### B. Waiver of the Statute of Limitations (Count I)

■■■ The crime of submitting a false statement to the government is complete when the false statement is mailed, and the statute of limitations starts to run from that date. *United States v. Smith,* 740 F.2d 734, 736. *Accord, Butzman v. United States,* 205 F.2d 343, 351 (6th Cir.), *cert. denied,* 346 U.S. 828, 74 S.Ct. 50, 98 L.Ed. 353 (1953). Count One of the indictment charges defendants with making false statements in a letter dated March 27, 1981, in violation of 18 U.S.C. § 1001. The five-year general statute of limitations applies to prosecutions under 18 U.S.C. § 1001. 18 U.S.C. § 3282. Accordingly, defendants argue that the September 10, 1986 indictment is untimely, and Count One should be dismissed. I agree.

The government argues that waivers filed by the defendants extended the statute of limitations for prosecution under 18 U.S.C. § 1001 to October 3, 1986. However, the Sixth Circuit has held that the statute of limitations in criminal cases "create[s] a bar to the right of prosecution" and that "an indictment, found after the expiration of the time for beginning prosecution, is barred by the statute of limitations and is not waived by the fact that the prosecution was withheld on account of an agreement with the accused...." *Benes v. United States,* 276 F.2d 99, 108–09 (6th Cir.1960). This view has also been adopted by the Tenth Circuit. *Waters v. United States,* 328 F.2d 739, 743 (10th Cir.1964). More recently, the Seventh and Fourth Circuits have recognized that the Sixth and Tenth Circuits hold that a statute of limitations in a criminal case acts as a jurisdictional bar. *United States v. Meeker,* 701 F.2d 685, 688 (7th Cir.1983), *cert. denied,* 464 U.S. 826, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983); *United States v. Williams,* 684 F.2d 296, 300 (4th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 961 (1983).

The government argues that this court should ignore the holding of *Benes.* It offers three reasons for this unprecedented disregard of an existing circuit rule. First, it seems to suggest that the Sixth Circuit implicitly overruled *Benes* in *United States v. Hook,* 781 F.2d 1166 (6th Cir.1986). Second, it argues that *Benes* is contrary to a sixty-year-old Supreme Court case, *Biddinger v. Commissioner of Police,* 245 U.S. 128, 38 S.Ct. 41, 62 L.Ed. 193 (1917), which rests on what the government itself characterizes as "an old, abstruse" opinion written in 1872. Finally, the government argues that this court should ignore *Benes* on the strength of the fact that six other federal jurisdictions have chosen not to make criminal statutes of limitations jurisdictional. I am not persuaded by any of these arguments.

Although the government does not explicitly state its purpose in discussing *United States v. Hook,* I can only presume that it is attempting to suggest that the Sixth Circuit in that case implicitly overruled *Benes.* I find this an untenable position. On appeal the defendant in *Hook* argued that there was a possibility that he was convicted under two counts of a six count indictment on the basis of evidence wholly outside the statute of limitations period. Citing "the total lack of agreement and the uncertainty that apparently existed at trial over the very operation of the statute of limitations," *Hook, supra* at 1173, the Court of Appeals held that the district judge's failure to give jury instructions concerning the statute of limitations was not plain error and the defendant's conviction was thus not barred by the statute of

limitations. To this ruling the court added a footnote:

> Due to our disposition of this case, it was unnecessary for us to consider, and we express no opinion concerning the precedential value of *Benes v. United States*, 276 F.2d 99 (6th Cir.1960), which presumably stands for the proposition that a statute of limitations acts as a nonwaivable jurisdictional bar.

*Id.* at n. 10.

Quoting this footnote in its brief, the government summarized the Sixth Circuit's ruling and then stated:

> However, an argument of lack of subject matter jurisdiction may be made at any time. [sic] so that if the statute of limitations were jurisdictional and had run, the defendant would have been able to raise it as an issue at any time, including the first time on appeal.

(Government's Opposition, Dec. 22, 1986 at 10 (citations omitted).) In light of the Sixth Circuit's unequivocal reservation of the *Benes* issue, I find it impossible to infer from this analysis that *Hook* overrules *Benes*.

Neither am I convinced by the government's argument that Supreme Court precedent requires that statutes of limitations be treated as jurisdictional. The cases cited by the government for this proposition are not controlling. *United States v. Cook*, 84 U.S. (17 Wall) 168, 21 L.Ed. 538 (1872), is over a hundred years old and, by the government's own admission, difficult to understand. And *Biddinger*, which cites *Cook*, was clearly preoccupied by issues that are inappropriate to an analysis of the question presented in the case at hand. *Biddinger* involved an extradition by one state of an alleged criminal who had fled from another state. As quoted by the government, the Court concludes, "[t]he statute of limitations is a defense and must be asserted on the trial by the defendant...." *Biddinger, supra,* 245 U.S. at 135, 38 S.Ct. at 43. However, the true import of this phrase can only be appreciated when it is read in the context of the portion of the sentence that the government omitted from its brief. The entire quote reads:

> The statute of limitations is a defense and must be asserted on the trial by the defendant and the form of the statute in Illinois, which the appellant seeks to rely upon, makes it especially necessary that the claimed defense of it should be heard and decided by the courts of that state.

*Id.* (citations omitted). The central issue in *Biddinger* was not the effect of making a federal statute of limitations a non-waivable jurisdictional bar. Rather, the overriding concern was how to interpret Article IV, Section 2 of the Constitution, so as to preserve state sovereignty while ensuring that state constitutions requiring that people be tried in the county or district in which they allegedly committed a crime, not become shields for guilty individuals seeking to immunize themselves by moving from state to state.

Finally, I am not persuaded that I should ignore *Benes* by the fact that six of the other twelve federal circuits hold that the statute of limitations does not go to jurisdiction. A rule that the running of the statute of limitations cannot be waived in the criminal setting serves a number of important policy functions. Prime among these is restraint of governmental powers. While statutes of limitations are generally thought of as protecting individuals against having to answer to charges based on stale facts, they also serve to restrain the power of the sovereign to act against an accused. *See Waters, supra* at 743. The jurisdictional view of the statute of limitations followed in this circuit and the Tenth Circuit ensures that these two functions do not merge. Under the jurisdictional approach, the statute of limitations exerts an independent force on the government. It requires that the government vigorously investigate those cases which it chooses or hopes to prosecute, and restrains it from putting to an accused individual an oppressive choice: whether "to agree" to a waiver because the government suggests that if it is afforded more time to investigate it might decide not to indict, or to refuse and run the risk of being unfairly charged by a government prosecutor trying to beat the

statute of limitations. The coercive power of the government is too great to allow it to assume such a leveraged position. Thus, until the Sixth Circuit or the Supreme Court decides that the jurisdictional restraint on the statute of limitations period is not worth preserving, this court will follow the *Benes* rule.

### III. *Conclusion*

For the reasons stated above, defendants' motion for dismissal of the indictment on the grounds that the offenses charged are barred by the applicable statute of limitations is granted as to all counts and the indictment is dismissed.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

In accordance with the opinion filed this date,

IT IS HEREBY ORDERED that defendants' motion for dismissal of the indictment on the grounds that the offenses charged are barred by the applicable statute of limitations is granted as to all counts, and the indictment is dismissed.